ANCHORAGE DAILY NEWS, INC., an Alaska Corporation, Appellant,

v.

ANCHORAGE TIMES PUBLISHING COMPANY, an Alaska Corporation, Appellee.

No. 4966.

Supreme Court of Alaska.

July 31, 1981.

Philip M. Battaglia and Richard I. Gilchrist, Flint & MacKay, Los Angeles, Cal., and A. Robert Hahn, Hahn, Jewell & Stanfill, Anchorage, for appellant.

John C. Coughenour and Guy P. Michelson, Bogle & Gates, Seattle, Wash., and Douglas F. Strandberg and James D. Sourant, Anchorage, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and COOKE,* Superior Court Judge.

## OPINION

RABINOWITZ, Chief Justice.

The Anchorage Daily News, Inc. (hereinafter the "News") appeals from a judgment in favor of the Anchorage Times Publishing Company (hereinafter the "Times"). The judgment granted declaratory and injunctive relief under which the News was prohibited from submitting certain disputes to arbitration. The News had contended that those disputes were arbitrable; the Times had contended that they were not.

This appeal has its roots in a joint operating agreement (hereinafter "J.O.A.") which was entered into by the parties on July 29, 1974. The agreement merged all non-editorial departments of the two otherwise competing newspapers into one operation. On February 9, 1977, the News filed an action in the United States District Court in Alaska, alleging antitrust violations and breach of the J.O.A. Relying on an arbitration provision in the J.O.A., the federal district court ordered arbitration of certain disputes.

Apparently dissatisfied with the conclusions reached by the arbitration panel, the

---

* Cooke, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16, of the Constitution of Alaska.

News and the Times reached a settlement of their disputes on September 13, 1978. This settlement became embodied chiefly in a "settlement and release" document of September 29, 1978. Additionally, a "stipulation and order of dismissal" was entered into by the parties on September 29, 1978, and the federal district court's "order of dismissal" was entered on October 2, 1978, which dismissed with prejudice the antitrust suit filed in 1977.

Each of the three documents mentioned above retained the jurisdiction of the arbitration panel to resolve certain disputes which might arise between the parties prior to March 31, 1979. Certain disputes did arise. The News believed that the disputes were arbitrable, and persuaded the federal court to schedule an arbitration proceeding to resolve those disputes. The Times did not believe that the disputes were arbitrable, and successfully persuaded the Alaska superior court to issue a series of rulings enjoining the arbitration proceeding scheduled by the federal court, which rulings are the subject of this appeal.

For an understanding of the precise issues presented, it is necessary to set forth the following extended chronology of the events leading to the judgment of the superior court.

## I. FACTS

July 29, 1974—The Times and News entered into the joint operating agreement (J.O.A.) merging all non-editorial departments into one facility.

February 9, 1977—The News filed an antitrust and breach of contract action against the Times, for alleged violations of the J.O.A., in federal district court. The Times then sought to terminate the J.O.A. The federal court enjoined the Times from terminating the J.O.A. Relying on an arbitration provision in the J.O.A., the federal court ordered arbitration of certain disputes.

February, 1978—The three-person federal arbitration panel convened. The parties agreed that the arbitration was governed by the Alaska Uniform Arbitration Act, AS 09.43.010 *et seq.*

June 22, 1978—The federal arbitrators reached their decisions, which the parties apparently found unsatisfactory and which were never adopted by the federal court. Thereafter the News and Times began negotiations toward settling the lawsuit in chief.

September 13, 1978—The parties orally agreed upon a settlement. One provision of the settlement was that the Times would continue to publish the News and perform other non-editorial functions until March 31, 1979, at which time the J.O.A. would be terminated. The parties also stipulated that the federal arbitration panel convened in April and May would retain jurisdiction over any disputes which might arise prior to March 31, 1979.

September 29, 1978—The "settlement agreement and release," representing the final and formal understanding between the parties, was executed. The provision of the agreement which lies at the core of this dispute, found in paragraph 3, states:

> The Arbitration Panel will retain jurisdiction over any and all disputes arising between the parties under the Agreement as a result of statements, acts, or omissions of either party after execution of this Settlement Agreement and Release. However, the jurisdiction of the Arbitration Panel will terminate March 31, 1979, or at such later time that the Arbitration Panel renders a decision on any dispute submitted to it prior to March 31, 1979.

The term "Agreement," appearing in paragraph 3 above, is defined in paragraph 1(c) of the settlement agreement as the Joint Operating Agreement of 1974, as modified by the Settlement Agreement:

> (c) Defendants, plaintiff and counterclaim defendants agree to perform all duties and obligations required of them pursuant to the terms and provisions of the agreement entered into between the News and the Anchorage Times Publishing Company, dated July 29, 1974 ("the Agreement"), *as modified hereinafter.* [emphasis added]

A second document, the "Stipulation and Order of Dismissal" was also executed on behalf of the parties and filed with the federal court. The stipulation provides:

> [T]he Anchorage Newspaper Arbitration Panel shall retain jurisdiction over any disputes arising prior to March 31, 1979 under the Agreement entered into between the Anchorage Times Publishing Company and Northern Publishing Company dated July 19, 1974.

October 2, 1978—The federal court entered an order dismissing the antitrust case and pendent claims with prejudice, subject to a provision for continued arbitration panel jurisdiction "over any disputes arising prior to March 31, 1979." This provision is similar to that which appeared in the "stipulation and order of dismissal."

December, 1978—Pursuant to its understanding of the settlement agreements, the News sought a return to pre-J.O.A. status in regard to its contracts for newsprint supplies, which contracts had been assigned to the Times under the terms of the J.O.A.

January 8, 1979—Judge Fitzgerald of the federal district court was notified by a copy of the correspondence between the News and the Times about a dispute concerning the newsprint, and he noted its "existence."

January 11, 1979—The publisher of the Times acknowledged by letter its obligation to provide the News with newsprint.

March 5, 1979—A dispute concerning use of the Family Weekly Sunday supplement was presented to Judge Fitzgerald, by correspondence from the News.

March 7, 1979—Judge Fitzgerald conferred with counsel for both parties regarding the Family Weekly and newsprint disputes by telephone.

March 9, 1979—The News made a formal written demand on the Times to terminate the Times' contractual rights to the Family Weekly supplement.

March 14, 1979—The News wrote again to the Times regarding the Family Weekly dispute.

March 19, 1979—The News wrote the federal court again concerning the Family Weekly dispute.

April 3, 1979—Judge Fitzgerald again conferred by telephone with counsel for both parties concerning the newsprint and Family Weekly disputes. The parties did not object at the time to Judge Fitzgerald's suggestion that they utilize the arbitration procedures found in the September 19, 1978, settlement documents to resolve these two disputes.

April 6, 1979—The Times' counsel wrote counsel for the News, stating that the Times' agreement to the arbitration date was to be without prejudice to its right to assert that the Family Weekly dispute was "not subject to arbitration."

April 9, 1979—Judge Fitzgerald confirmed his direction of April 3, and scheduled the arbitration proceeding to begin May 2, 1979. Counsel for both parties agreed to this date for commencing arbitration.

April 23, 1979—In a motion to stay arbitration filed with the federal court, the Times argued that the two disputes in question were not within the scope of the agreement to arbitrate. Shortly thereafter Judge Fitzgerald arranged a telephone conference call to discuss the motion.

April 24, 1979—Judge Fitzgerald disqualified himself from hearing the Times' motion to stay arbitration because of his involvement in the settlement discussions of the antitrust lawsuit, stating that another federal judge should decide the issue of federal jurisdiction.

April 25, 1979—The matter was assigned to Judge Stanley A. Weigel for determination of the issue of federal jurisdiction. Judge Weigel believed that the federal jurisdiction issue needed full briefing, and scheduled briefs on this question to be submitted to him on May 4, 1979, two days after the scheduled commencement of arbitration. He declined to stay the scheduled arbitration. Apparently he also made an informal suggestion that the Times contact the arbitration panel directly regarding a stay.

April 26, 1979—The parties contacted Russell Arnett, the panel's chairman, in a conference call. Mr. Arnett refused to stay the scheduled arbitration, and suggested that the Times seek a stay in a state superior court.

April 30, 1979—The Times filed an action for declaratory and injunctive relief in superior court. Judge Kalamarides concluded that the superior court had jurisdiction under the terms of the Alaska Uniform Arbitration Act, AS 09.43.010–.180, and that a temporary restraining order should be issued staying arbitration, pending a state court determination of the issues raised by the Times. A consolidated hearing of the Times' motion for preliminary injunction and a hearing of the action on the merits, pursuant to Alaska Civil Rule 65(a)(2), was set for May 10, 1979.

May 10, 1979—A hearing on the merits of the arbitrability of the disputes was held before Judge Moody, consisting of the introduction of documents into evidence and the arguments of counsel.

May 15, 1979—A memorandum decision was issued by Judge Moody, permanently restraining the News from proceeding with arbitration of the newsprint and Family Weekly disputes.

September 17, 1979—A judgment, supported by findings of fact and conclusions of law, was entered by Judge Moody, permanently enjoining the News from proceeding with arbitration of the newsprint and Family Weekly disputes, and awarding attorney's fees and costs to the Times. The News then appealed.

## II. JURISDICTION

The initial legal question which must be resolved is whether the superior court erred in holding that it had jurisdiction to determine whether the disputes were arbitrable. The superior court relied upon AS 09.43.020(b), which provides:

On application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate. The issue, when in substantial and bona fide dispute, shall be immediately and summarily tried and the stay ordered if no agreement is found to exist. If found for the opposing party, the court shall order the parties to proceed to arbitration.

Under Alaska law, the superior court definitely had jurisdiction to determine, in advance of arbitration, whether there was an agreement to arbitrate. The News urges, however, that state and federal courts should avoid conflicts over their jurisdiction, that the superior court should have refrained from exercising jurisdiction over this matter, and that it should have permitted the federal court to determine whether the disputes were arbitrable.

We think the jurisdictional issue presented in this appeal is controlled by the doctrine announced in *Donovan v. City of Dallas*, 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964), and followed in the *General Atomic* cases, *General Atomic Co. v. Felter*, 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977) (*General Atomic* I), and *General Atomic Co. v. Felter*, 436 U.S. 493, 98 S.Ct. 1939, 56 L.Ed.2d 480 (1978) (*General Atomic* II).

In *Donovan*, citizens of Dallas brought an action in a Texas state court seeking to restrain the city's construction of an additional runway at the local airport. The city prevailed in the state court system and, on appeal, the United States Supreme Court denied certiorari. The citizens then sued the city on the same issues in the federal district court. In addition to pleading res judicata, the city obtained an injunction in state court preventing the citizens from prosecution of the federal suit and from beginning any litigation of the same issues in any other court. *See* Note, *State Injunction of Proceedings in Federal Courts*, 75 Yale L.J. 150, 152–53 (1965). The Supreme Court noted that the citizens had a right to file their case in a federal court, "a right which is theirs by reason of congressional enactments passed pursuant to congressional policy." *Donovan v. City of Dallas*, 377 U.S. at 412, 84 S.Ct. at 1582, 12 L.Ed.2d at 413.

Although "*Donovan* presented as compelling a case as there could be for permitting a state court to enjoin the further prosecution of ... federal proceedings," *General Atomic I*, 434 U.S. at 17, 98 S.Ct. at 78, 54 L.Ed.2d at 204, the *Donovan* court emphasized "that state courts are completely without power to restrain federal court proceedings in *in personam* actions . . . ." *Donovan v. City of Dallas*, 377 U.S. at 413, 84 S.Ct. at 1582, 12 L.Ed.2d at 413.

*Donovan* was relied upon in the *General Atomic* decisions. The *General Atomic* controversy arose out of an agreement by which United Nuclear Corporation (UNC) was to supply the General Atomic Company (GAC) with uranium which GAC, in turn, was obligated to supply to several buyers. When the price of uranium increased fivefold between 1973 and 1975, UNC ceased uranium delivery, and filed a declaratory judgment action in a New Mexico state court to avoid its obligations to GAC. *General Atomic I*, 434 U.S. at 12–13, 98 S.Ct. at 76–77, 54 L.Ed.2d at 200–01.

Litigation was not confined to New Mexico. Because of the resulting breaches of various contracts by GAC, Indiana & Michigan Electric Co. sued GAC for damages in a New York federal court, Commonwealth Edison Co. sued GAC to compel arbitration in an Illinois federal court, and Duke Power Co. sued GAC demanding arbitration in a North Carolina federal court. UNC, having been warned that GAC might move to implead UNC in the New York suit, obtained a preliminary injunction from the New Mexico state court preventing GAC from filing a suit or third-party complaint against UNC. The New Mexico Supreme Court affirmed the injunctive order. The United States Supreme Court reversed by a per curiam opinion relying on *Donovan*. *General Atomic I*, 434 U.S. at 19, 98 S.Ct. at 79, 54

L.Ed.2d at 204–05. After that decision, GAC filed a demand for arbitration against UNC before the American Arbitration Association, and attempted to bring UNC into the arbitration proceedings being held in the Illinois and North Carolina actions. The New Mexico state court decided that GAC had waived any arbitration right with UNC because its demands were untimely. It issued another injunction to stay both the proceedings before the American Arbitration Association and the inclusion of UNC in the arbitration proceedings connected with the North Carolina and Illinois actions. *General Atomic II*, 436 U.S. at 494–95, 98 S.Ct. 1939–40, 56 L.Ed.2d at 482–83.

In a second per curiam opinion, the Supreme Court observed that the New Mexico state court had done "precisely what we held that it lacked the power to do: interfere with attempts by GAC to assert in federal forums what it views as its entitlement to arbitration." 436 U.S. at 496, 98 S.Ct. at 1941, 56 L.Ed.2d at 484 (footnote omitted).[1] Of particular relevance, and in our view dispositive of the jurisdictional issue in this case, is the following passage from the second *General Atomic* opinion:

> [T]he Santa Fe court is without power under the United States Constitution to interfere with efforts by GAC to obtain arbitration in federal forums on the ground that GAC is not entitled to arbitration or for any other reason whatsoever. GAC, as we previously held, has an absolute right to present its claims to federal forums.[2]

In light of the holdings of the *General Atomic* cases we conclude that the superior court erred in permanently enjoining the News from proceeding with arbitration of the newsprint and Family Weekly disputes. In short, the superior court

---

1. The Supreme Court explained, in regard to its first opinion:

   Clearly, our prior opinion did not preclude the court from making findings concerning whether GAC had waived any right to arbitrate or whether such a right was contained in the relevant agreements. Nor did our prior decision prevent the Santa Fe court, on the basis of such findings, from declining to stay its own trial proceedings as requested by GAC pending arbitration in other forums. *General Atomic Co. v. Felter* (II), 436 U.S. 493, 496–97, 98 S.Ct. 1939, 1940–41, 56 L.Ed.2d 480, 484 (1978).

2. *General Atomic II*, 436 U.S. at 497, 98 S.Ct. at 1941, 56 L.Ed.2d at 484.

should have refrained from exercising whatever jurisdiction it may have had to stay the arbitration proceedings. In our view no meaningful distinction can be drawn between the underlying factual situation in the *General Atomic* cases and the instant case. Since the superior court's stay of arbitration was an interference with the News' efforts to obtain arbitration in a federal forum, it should not have issued.

Reversed.

CONNOR, Justice, dissenting.

I do not agree that the superior court erred in permanently enjoining the arbitration proceedings. The majority finds the following passage in *General Atomic Co. v. Felter (II)*, 436 U.S. 493, 98 S.Ct. 1939, 56 L.Ed.2d 480 (1978), dispositive:

"[T]he Santa Fe court is without power under the United States Constitution to interfere with efforts by GAC to obtain arbitration in federal forums on the ground that GAC is not entitled to arbitration or for any other reason whatsoever. GAC, as we previously held, has an absolute right to present its claims to federal forums."

*Id.* at 497, 98 S.Ct. at 1941, 56 L.Ed.2d at 484. Here, the News is in no way prevented from seeking an order to arbitrate in a federal forum.

On April 3, 1979, the parties agreed to arbitrate. When problems developed with that agreement, the Times filed a motion to stay arbitration in the federal district court and later in the superior court.[1] Unlike the stay issued by the New Mexico state court, the stay issued by the Alaska superior court enjoins only the arbitration, not proceedings in any federal district court or forum. The federal proceedings related to this controversy are awaiting a decision regarding whether the federal courts have jurisdiction to issue a stay of arbitration. The Alaska superior court did not enjoin those proceedings. The proposed arbitration was not from an order of any federal court, nor did the parties file a demand for arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (1976). Thus the arbitration was not in a federal forum.

The superior court, in entering findings of fact and conclusions of law on whether the News had waived its right to arbitrate and whether the right was found in the agreements between the two newspapers, did not run afoul of the prohibitions in *General Atomic II*. The Supreme Court explained that the previous decision in *General Atomic Co. v. Felter (I)*, 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977), "did not preclude the [state] court from making findings concerning whether GAC had waived any right to arbitrate or whether such a right was contained in the relevant agreements." *General Atomic II*, 436 U.S. at 497, 98 S.Ct. 1941, 56 L.Ed.2d at 484. The Court stated that based on such findings the state court could decline to stay its own trial proceedings. However, the state court was not limited to declining to stay its own proceedings. The paramount prohibition by the Supreme Court was that whatever orders the state court decided to issue, no order or decision could interfere with proceedings in federal forums. The superi-

---

1. The pendency of a federal proceeding, still in the stages of determining whether the federal court had jurisdiction, "is no bar to prosecution of the same cause before a court of the other sovereign. Both actions may proceed as if the other did not exist." Arnold, State Power to Enjoin Federal Court Proceedings, 51 Va.L.Rev. 59, 70 (citing H. Hart & H. Weschsler, The Federal Courts and the Federal System 1057–58 (1953)). Concurrent state and federal actions, although wasteful, *see* Note, Anti-suit Injunctions between State and Federal Courts, 32 U.Chi.L.Rev. 471, 502 (1965), are contemplated, *see Kline v. Burke Constr. Co.*, 260 U.S. 226, 230, 43 S.Ct. 79, 81, 67 L.Ed. 226, 230

(1922), and the remedy is for the prevailing party to move for summary dismissal in the other court based on the principles of res judicata. *See id.*; Note, State Injunction of Proceedings in Federal Court, 75 Yale L.J. 150, 157, 159 (1965). In the opposite situation, the United States Supreme Court has held that a federal court may not enjoin proceedings in state court over a controversy that has been decided in federal court. The parties in the state proceeding must plead and prove res judicata. *Toucey v. New York Life Insurance Co.*, 314 U.S. 118, 129, 141, 62 S.Ct. 139, 141, 147, 86 L.Ed. 100, 103, 109 (1941).

or court in issuing the stay merely acted upon its findings of fact and conclusions of law. Since there was no arbitration in front of or ordered by a federal forum, the stay did not interfere with the News' presentation of its claims in a federal forum. Thus, I do not view the superior court's stay as granted in the absence of proper jurisdiction.